IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID CROSSEN,<br><br>    Plaintiff,<br>  v.<br><br>CV THERAPEUTICS, et al.,<br><br>    Defendants.<br>_____/ | No. C 03-03709 SI<br><br>**ORDER GRANTING PLAINTIFF'S MOTION TO CERTIFY THE CLASS AND APPOINT LEAD PLAINTIFF, AND DENYING PLAINTIFF'S MOTION FOR CONTEMPT AND SANCTIONS** |

    Currently pending before the Court is plaintiff David Crossen's motion to certify a class and appoint him as lead plaintiff, and plaintiff's motion to hold defendants in contempt. Having carefully considered the arguments of counsel and the papers submitted, the Court hereby GRANTS plaintiff's motion to certify the class and appoint David Crossen as lead plaintiff and DENIES plaintiff's motion for a contempt finding.

**BACKGROUND**

    This is a securities class action against CV Therapeutics, Inc. ("the Company") and certain of its officers (the "individual defendants") under Sections 10(b) and 20(a), and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act"). The case is brought on behalf all purchasers of the publicly-traded securities of the Company between December 30, 2002 and December 5, 2003 ("the class period").

    CV Therapeutics is a Palo Alto, California biopharmaceutical company "focused on the discovery, development and commercialization of new small molecule drugs for the treatment of cardiovascular diseases." Consol Compl. ¶ 2, 16. Plaintif alleges that, throughout the class period, defendants misled analysts, the investing public and even the FDA [ Food and Drug Administration] into believing that their novel anti-anginal drug, Ranexa, "was safe and effective for public use in an unrestricted population, and that the Company had

1  conducted sufficient clinical studies to prove it." Consol. Compl. ¶ 3. The complaint alleges that defendants'
2  false and misleading statements artificially inflated the Company's stock. Consol. Compl. ¶ 4.

3  Plaintiffs allege that in July, 2003, defendants misrepresented that the FDA had scheduled Ranexa for
4  review by its Cardiovascular-Renal Advisory Committee (the "Advisory Committee") on September 15-16,
5  2003, "an event which signifies that the FDA is ready to act on the drug." Consol. Compl. ¶ 5. Yet "[i]nternal
6  FDA notes . . . reveal that . . . there was little likelihood that such a meeting could take place." Id. When the
7  Company acknowledged on August 1, 2003, that "this alleged meeting was 'cancelled,'" the stock price fell
8  20.8%. Id. On October 23, 2003, the Company announced that the Advisory Committee would review
9  Ranexa on December 9, 2003, resulting in a stock price increase from $18.22 per share on October 22, 2003
10 to $22.45 per share on October 23, 2003. Consol. Compl. ¶ 6.

11 On October 30, 2003, the FDA issued an "approvable letter with conditions" indicating that additional
12 clinical information was needed prior to approval. Consol. Compl. ¶ 7, citing Ex. 2. On this news, the stock
13 price fell 21.7%. Id. On the eve of the December 9, 2003 hearing, the FDA released internal documents in
14 connection with its review of the Company's Ranexa New Drug Application (NDA). Documents released
15 included the October 30, 2003 Approvable Letter, and revealed that the FDA found "major deficiencies
16 pertaining to the Company's clinical studies, including the QT prolongation,[1] the efficacy in women, and the fact
17 that 98% of the study population was Caucasian." Consol. Compl. ¶ 9, citing Ex. 4. On December 8, 2003,
18 the stock price fell 27%. Consol. Compl. ¶ 10. According to the complaint, the defendants engaged in the
19 following conduct: first, the Company's July 7, 2003 announcement of a forthcoming Advisory Committee
20 meeting was "misleading because neither the FDA nor CV Therapeutics had in fact yet decided to go ahead
21 with a September 2003 Advisory Committee meeting for Ranexa because of severe deficiencies in the NDA";
22 second, the Company "was aware that its data regarding its findings of QT interval prolongation posed serious
23 concerns and had been portrayed in a misleading fashion to the investing public"; third, because "of the serious
24 safety concerns regarding QT/QTc prolongation limiting chances of approval for the drug, the FDA had

---

[1] According to the Complaint, "Ranexa is an anti-anginal therapy drug, known to extend the QT interval. Adverse pro-arrhythmic effects linked to QT interval prolongation are of concern to the FDA. Side effects linked to QT interval prolongation include torsade de pointes, ventricular tachycardia, ventricular arrhythmia, ventricular ectopy, ventricular fibrillation and flutter, cardiac arrest, sudden death, syncope, dizziness and palpitations." Consol. Compl. ¶ 34.

encouraged CV Therapeutics to study the drug as a second-line therapy"; and finally, defendants knew that "the safety and efficacy data of Ranexa were so flawed and deficient that the NDA would not be approved without additional clinical trials." Consol. Compl. ¶ 14.

David Crossen was initially appointed as lead plaintiff in this action in November 2003. The defendants are Louis G. Lange, a Company founder and its Chairman and Chief Executive Officer ("CEO"); Daniel K. Speigelman, a Senior Vice President of the Company and its Chief Financial Officer (CFO); and CV Therapeutics. See August 5, 2004 Order.

Plaintiffs partly relied on four confidential witness interviews (CW 1-4) for the complaint's factual allegations. According to the witness interview statements, each confidential witness is a former employee or independent contractor of the Company. Consol. Compl. (Witness Interviews) at 53.

Now before the Court is plaintiff's motion to certify the class and appoint David Crossen as lead plaintiff. Plaintiff has also filed a motion for a finding of civil contempt and sanctions against defendant for allegedly disclosing to CW3 the identities of CW1 and CW2.

**LEGAL STANDARDS**

**1.   Class certification**

A court may certify a class if the plaintiff demonstrates that all of the requirements of Federal Rule of Civil Procedure 23(a) are satisfied and at least one of the requirements of Rule 23(b) is satisfied. See Fed. R. Civ. P. 23; Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996). Rule 23(a) provides that a court may certify a class only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

In addition to demonstrating that the Rule 23(a) requirements are met, plaintiff must establish one or more of the following grounds for maintaining the suit as a class action pursuant to Rule 23(b): (1) that there is a risk of substantial prejudice from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be appropriate; or (3) that common questions of law or fact predominate and the class

3

action is superior to other available methods of adjudication. Fed. R. Civ. P. 23(b).

In determining the propriety of a class action, the question is not whether the plaintiffs have stated a cause of action or will prevail on the merits, but, rather, whether the requirements of Rule 23 are met. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974) (citing Miller v. Mackey Int'l, Inc., 452 F.2d 424, 427 (5th Cir. 1971)). The Court is obliged to accept as true the substantive allegations made in the complaint. See In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 691 F.2d 1335, 1342 (9th Cir. 1982); Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975). However, it "need not blindly rely on conclusory allegations which parrot Rule 23 requirements [and] may . . . consider the legal and factual issues presented by plaintiff's complaints." 2 Herbert Newberg & Alba Conte, Newberg on Class Actions § 7.26 (3d ed. 1992). The Court will consider the allegations of the complaint, but going beyond the pleadings to analyze the claims, defenses, relevant facts, and applicable substantive law may be necessary in order to evaluate whether certification is appropriate. Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996). The decision to certify a class is committed to the discretion of the district court. Doninger v. Pacific Northwest Bell, Inc., 564 F.2d 1304, 1309 (9th Cir. 1977).

**2.   Motion for sanctions**

A district court has broad discretion to issue sanctions for violation of its discovery orders pursuant to Federal Rule of Civil Procedure 37. See Lew v. Kona Hospital, 754 F.2d 1420, 1425 (9th Cir. 1985); United States v. Sumitomo Marine & Fire Ins. Co., Ltd., 617 F.2d 1365, 1369 (9th Cir. 1980). The district court may issue monetary sanctions or an order "refusing to allow the disobedient party to support or oppose designated claims or defenses." Fed. R. Civ. P. 37(b)(2)(B); Sumitomo, 617 F.2d at 1369.

**DISCUSSION**

**1.   Motion for Class Certification**

The question presented by plaintiff's class certification motion is whether this action meets Rule 23's requirements of commonality, numerosity, typicality, and adequacy. Defendants oppose plaintiff's motion for class certification on one specific ground: that lead plaintiff David Crossen, who both sold uncovered call

4

options and bought CVT common stock, is subject to unique defenses, and is therefore an atypical and inadequate class representative.

According to defendants, Crossen primarily sold CVT call options, which are option contracts that give the buyer the right to purchase CVT stock from Crossen for a fixed price. See Defs.' Opp'n at 3:7-9. Since Crossen's appointment as lead plaintiff in November 2003, he has supplemented his disclosures and revealed call option contracts, including a high percentage of call options that were "uncovered" by stock he owned. A seller of call options – particularly of uncovered call options – may be harmed by significant gains in the stock price and will profit only if the stock price falls or does not materially rise.[2] Moreover, Crossen's day trading strategy, defendants contend, was intended "to profit from short-term price volatility rather than long-term gains in share value." Defs.' Opp'n at 8:20-22. They argue that this trading strategy differentiates Crossen from the typical CVT investor, who bought CVT common stock believing it was a good investment and is therefore entitled to the presumption of reliance under the fraud-on-the-market theory.

The primary focus of defendants' argument is that Crossen is subject to the unique defense of lack of reliance. Under the ordinary fraud-on-the-market theory, a plaintiff is entitled to the presumption that he or she buys or sells stock "in reliance on the integrity of [the market] price." Basic, Inc. v. Levinson, 485 U.S. 224, 247 (1988). This presumption may be rebutted if the defendant can make a showing that "severs the link" between the alleged misrepresentation and either the price received by the plaintiff or his decision to trade at a fair market price. Id. at 248. According to defendants, the link between Crossen's trading decisions and defendants' misrepresentations has been severed by several facts: (1) that Crossen sold a significant number of uncovered call options, making him akin to a short seller; (2) that Crossen was a day trader who traded on short-term volatility in stock price rather than relying on the integrity of the market price; (3) that Crossen continued to trade in CVT stock and options after the class periods ended; and (4) Crossen's apparent strategy of "betting against" FDA approval of Ranexa. Defendants also contend that Crossen is subject to a second unique defense based on his credibility, because he previously disclosed only transactions involving CVT common stock but few sales of call options, and only since his appointment as class representative has he

---

[2] According to defendants, while sellers of call options are harmed by significant gains in stock price, sellers of uncovered call options are at greater risk if the stock price rises dramatically, because they would have to purchase stock to cover the call at a great loss.

5

disclosed the true extent of his uncovered call option sales.

### A. Lack of reliance

Plaintiff contends that Crossen's trading strategy itself does not rebut the presumption of reliance or present a unique defense, and that defendants have not actually shown a lack of reliance on the integrity of the market price. According to plaintiff, Crossen's deposition testimony clearly establishes that he relied on market information and market price for his investment decisions, including information about CVT contained in financial statements and news and industry publications. Moreover, plaintiff disputes defendants' characterization of Crossen's options trading as "day trading," and the equivalent of short-selling, and they contend that his post-class period purchases do not make him atypical. In support of its reply brief, plaintiff submits the expert declaration of Jane D. Nettesheim and a further declaration of David Crossen stating that he was not a day trader of CVT stock.[3] Defendants have filed a surreply brief, arguing that the expert admits that Crossen was betting against FDA approval of Ranexa and that he did sell many uncovered call options, differentiating him from other options traders who might be adequate class representatives.

The typicality requirement is usually met if the representative's claims arise from the same event or course of conduct that gives rise to the claims of other class members. The Ninth Circuit has held that typical claims need only be "reasonably co-extensive with those of absent class members; they need not be substantially identical." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1988). The test is "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). Generally, investors who trade options are entitled to the fraud-on-the-market presumption because the value of options is directly related to the value of common stock. The question is whether Crossen's frequent transactions involving uncovered call options, his continued sale of options after the class period, and his alleged strategy of betting against Ranexa's approval make him unable to represent the class.

---

[3] During his deposition, however, Crossen admitted that he "would call [him]self a day trader." Johnson Decl., Ex. F at 38:10-11.

First, the Court finds that Crossen's sale of uncovered call options does not, on its own, rebut the presumption of reliance. Defendants rely on Silverstein v. Digital Equip. Corp., 1990 WL 71385, at *1 (D. Mass. May 22, 1990), where an investor who purchased stock and then sold covered call options two weeks later was deemed atypical by the district court. The Silverstein court did not explain its reasoning or supply sufficient facts for this Court to find it applicable here. There appears to be no direct authority regarding investors who sold uncovered call options, but defendants argue that Crossen's sale of these options makes him akin to a short seller. Short sellers have been rejected as adequate class representatives by several courts. See, e.g., In re Critical Path, Inc., 156 F. Supp. 2d 1102, 1109-10 (N.D. Cal. 2001); In re Terayon Coms. Sys., Inc., 2004 WL 413277, at *7-8 (N.D. Cal. Feb. 23, 2004). According to defendants, sellers of uncovered call options are like short sellers because they face potentially limitless losses if the stock increases significantly in price, and reap profits if the stock decreases in value.[4]

The Court does not reach the issue of whether sellers of uncovered call options are subject to the same potential defenses as short sellers, because even assuming arguendo that defendants' analogy is sound, Crossen's sale of call options does not make him atypical. Short sales do not in and of themselves render a lead plaintiff's claims atypical. Indeed, in Danis v. USN Communications, Inc., 189 F.R.D. 391 (N.D. Ill. 1999), on which plaintiff relies, the Court found adequate a plaintiff who both engaged in short selling of stock and made ordinary purchases during the class period. See also In re Cirrus Logic Sec., 155 F.R.D. 654, 660 (N.D. Cal. 1994). Danis is factually similar to this case, and the Court is persuaded by it. While the motivations behind short selling may be inconsistent with the assumptions underlying the fraud on the market theory, see Zlotnick v. Tie Communications, 836 F.2d 818, 822-23 (3d Cir. 1988), a plaintiff may still be entitled to the presumption of reliance if he makes ordinary purchases of common stock and sustains losses on these holdings. In addition to his call options, Crossen purchased CVT stock and suffered losses on that stock. These facts also distinguish this case from Terayon, where the putative lead plaintiff had engaged in a "campaign[] devised to lower the price of the stock in question." 2004 WL 413277, at *8. Here, there has

---

[4] Defendants also extrapolate this point from the reasoning in Deutschman v. Beneficial Corp., 132 F.R.D. 359, 370 (D. Del. 1990), where the court stated that purchases of call option contracts are more similar to purchases of stock than to short sales. According to defendants, this observation suggests that the sale of a call option is more like a short sale than like a purchase of stock.

been no allegation that Crossen's trading strategy was intended to adversely affect the stock price. Contrary to defendants' claim, therefore, Crossen's trading strategy itself does not render him an atypical plaintiff.

The Court also disagrees with defendants that Crossen's day trading activities render him atypical. The parties dispute the proper definition of the term "day trader," but the relevant question is whether Crossen focused on "technical price movements" or on fundamentals and on defendants' statements in deciding whether to buy or sell. Crossen has testified that he focused on fundamentals, and defendants have not successfully rebutted the presumption, and his testimony, that he did. Crossen Depo. 79-80; Crossen Decl. ¶¶ 14-15.[5]

The final issue is defendants' argument that Crossen's trading patterns demonstrate that he was betting against Ranexa's approval, and whether such a trading pattern would make him an atypical plaintiff. Defendants state that Crossen sold 60 call option contracts between October 14 and October 24, 2003, at strike prices between $1.58 to $6.47 higher than current trading prices, and each call had an expiration date after the October 30, 2003 expected approval date. They argue that, if Crossen had actually believed that the FDA would approve Ranexa in October, he would not have bet that the stock price would either decrease or increase less than two dollars.

While plaintiff does not directly address this argument in the reply, the record demonstrates that Crossen did rely on the integrity of the market for his decision to purchase CVT stock, and his investment decision to also sell uncovered call options does not defeat the presumption of reliance. Defendants have not shown that Crossen's "core investment strategy" was to "bet against" FDA approval of Ranexa and therefore against appreciation of CVT's stock price. Rather, Crossen's testimony shows that he sought to profit from his investment in CVT stock but to manage the risk of his investment by also participating in call option transactions. Crossen Depo at 78-80; Nettesheim Decl. ¶ 11-14. It thus goes without saying that Crossen would have benefitted financially had the FDA approved Ranexa immediately, as expected; his call options reduced the loss he suffered when FDA approval did not come through. Crossen suffered $118,553 in loss on his CVT stock as of December 5, 2003; his net gain from call option sales was $68,599, leaving him with

---

[5] Defendants also argue that Crossen continued to trade CVT stock after the class period and that this behavior demonstrates his lack of reliance. In reply, plaintiff points out that the December 11, 2003 date cited by defendants as the time of his last trade is the settlement date, not the transaction date, of his last call sale. Plaintiff states that Crossen's final stock purchase was on December 5, 2003, and his final call sale was on December 8, 2003, the day the fraud was revealed. Pl.'s Reply at 11:21-12:2.

net losses of approximately $50,000. Nettesheim Decl. ¶¶ 8, 9; Pl.'s Reply at 1 n. 1. Undoubtedly, then, Crossen experienced losses from the failure of FDA approval, and the "success" of his investment strategy does not make him an atypical plaintiff. Accordingly, Crossen is entitled to the presumption of reliance.

The Court hereby GRANTS plaintiff's motion to certify the class and appoint Crossen as lead plaintiff.

### B. Crossen's credibility

Defendants also contend that Crossen is subject to a unique defense regarding his credibility, because his original and amended certifications understated the correct number of his trades and did not mention call options at all. Plaintiff argues that, as Crossen has testified, his updates to his certifications were made in good faith and were belated because of difficulty obtaining information from his brokerage company. The Court does not consider there to be serious questions about Crossen's credibility that would give rise to a unique defense.

### 2. Plaintiff's Motion for Contempt and Sanctions

Plaintiff asks the Court to hold defendants in contempt and impose sanctions based on their alleged violation of this Court's December 7, 2004 order restricting disclosure of the identities of the confidential witnesses ("CWS") in this case. According to plaintiff, defendants' counsel disclosed to CW3 the identities of CW1 and CW2; plaintiff submits the declaration of CW3 attesting to this fact. In that declaration, CW3 also states that defense counsel made the potential threat that, if he did not provide a declaration retracting his prior statements to plaintiff, he would be deposed. CW3 Decl. ¶ 6. Plaintiff asks the Court to hold defendants in contempt and, as a sanction, to foreclose defendants from deposing any of the CWs.

Defendants submit a declaration from their counsel stating that he has no recollection of making this disclosure and that he believes it never occurred. See Pomerantz Decl. ¶ 4. They suggest that CW3 instead learned the identities of CW1 and CW2 through the biographical information in the CW statements, which defense counsel provided to CW3. In addition, defendants deny that defense counsel's statement constituted a threat of deposition, and argue that counsel was merely explaining that an affidavit would avoid the need for

a deposition. Defendants speculate that plaintiff's proposed sanction is merely an attempt to gain a litigation advantage in light of the recent refutation of the complaint's CW statements by two of the four CWs.

Taking CW3's and Jay Pomerantz's declarations together, the Court concludes that counsel did disclose the identities of CW2 and CW1 to CW3. CW3 states unequivocally that Mr. Pomerantz did so; counsel states merely that he does not recall revealing the names and does not believe he did so. However, the Court does not find that defense counsel's disclosure was a willful or blatant violation of its order. In addition, it does not consider defense counsel's statement about a deposition of CW3 to be a threat.

Accordingly, the Court declines to make the requested contempt finding or to impose the drastic sanction proposed by plaintiff. Plaintiff's motion is DENIED.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS plaintiff's motion to certify the class and appoint David Crossen as lead plaintiff and DENIES plaintiff's motion for sanctions. [Docket ## 138, 149]

**IT IS SO ORDERED.**

Dated: August 9, 2005

SUSAN ILLSTON
United States District Judge