IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re CV THERAPEUTICS, INC. SECURITIES LITIGATION _____/ | No. C 03-03709 SI<br>Member cases: 03-3768, 03-3790, 3920<br>**ORDER RE: DISCOVERY MOTIONS** |

On March 31, 2006, the Court heard oral argument on the parties' discovery motions. Having carefully considered the parties' papers and the arguments of counsel, the Court hereby GRANTS in part and DENIES in part plaintiff's motion to compel production and for an order to show cause, DENIES defendants' motion for a protective order, GRANTS plaintiff's motion to compel production of privileged documents, and REFERS the *in camera* review of documents claimed as privileged to a magistrate judge.

**BACKGROUND**

**1.   Factual background**

This is a securities class action against CV Therapeutics, Inc. ("the Company") and certain of its officers (the "individual defendants") under Sections 10(b) and 20(a), and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act"). The case is brought on behalf all purchasers of the publicly-traded securities of the Company between December 30, 2002 and December 5, 2003 ("the class period").

CV Therapeutics is a Palo Alto, California "biopharmaceutical company focused on the discovery, development and commercialization of new small molecule drugs for the treatment of cardiovascular diseases." Consol Compl. ¶ 2, 16. "Throughout the Class Period, defendants misled

analysts, the investing public and even the FDA [Food and Drug Administration] into believing that their novel anti-anginal drug, Raxena, was safe and effective for public use in an unrestricted population, and that the Company had conducted sufficient clinical studies to prove it." Consol. Compl. ¶ 3. The complaint alleges that defendants' false and misleading statements artificially inflated the Company's stock. Consol. Compl. ¶ 4.

Plaintiffs allege that in July, 2003, defendants misrepresented that the FDA had scheduled Raxena for review by its Cardiovascular-Renal Advisory Committee (the "Advisory Committee") on September 15-16, 2003, "an event which signifies that the FDA is ready to act on the drug." Consol. Compl. ¶ 5. Yet, "[i]nternal FDA notes . . . reveal that . . . there was little likelihood that such a meeting could take place." *Id.* When the Company acknowledged on August 1, 2003, that "this alleged meeting was 'cancelled,'" the stock price fell 20.8%. *Id.* On October 23, 2003, the Company announced that the Advisory Committee would review Raxena on December 9, 2003, resulting in a stock price increase from $18.22 per share on October 22, 2003 to $22.45 per share on October 23, 2003. Consol. Compl. ¶ 6.

On October 30, 2003, "the FDA issued an 'approvable letter with conditions' indicating that 'additional clinical information is needed prior to approval." Consol. Compl. ¶ 7, *citing* Ex. 2. On this news the stock price fell 21.7%. *Id.* "On the eve of the December 9, 2003" hearing, the FDA released internal documents in connection with its review of the Company's Raxena New Drug Application (NDA). Documents released included the October 30, 2003 Approvable Letter. The "documents reveal that the FDA found major deficiencies pertaining to the Company's clinical studies, including the QT prolongation,[1] the efficacy in women, and the fact that 98% of the study population was Caucasian." Consol. Compl. ¶ 9, *citing* Ex. 4. On December 8, 2003, the stock price fell 27%, Consol. Compl. ¶ 10, and analysts "slashed their estimates for the Company." Consol. Compl. ¶ 11.

According to the complaint, the defendants knew and concealed from the investing public the

---

[1] According to the Complaint, "Raxena is an anti-anginal therapy drug, known to extend the QT interval. Adverse pro-arrhythmic effects linked to QT interval prolongation are of concern to the FDA. Side effects linked to QT interval prolongation include torsade de pointes, ventricular tachycardia, ventricular arrhythmia, ventricular ectopy, ventricular fibrillation and flutter, cardiac arrest, sudden death, syncope, dizziness and palpitations." Consol. Compl. ¶ 34.

2

1 following information: first, the Company's July 7, 2003 announcement of a forthcoming Advisory
2 Committee meeting was "misleading because neither the FDA nor CV Therapeutics had in fact yet
3 decided to go ahead with a September 2003 Advisory Committee meeting for Raxena because of severe
4 deficiencies in the NDA"; second, the Company "was aware that its data regarding its findings of QT
5 interval prolongation posed serious concerns and had been portrayed in a misleading fashion to the
6 investing public"; third, because "of the serious safety concerns regarding QT/QTc prolongation
7 limiting chances of approval for the drug, the FDA had encouraged CV Therapeutics to study the drug
8 as a second-line therapy"; finally, defendants knew that "the safety and efficacy data of Raxena were
9 so flawed and deficient that the NDA would not be approved without additional clinical trials." Consol.
10 Compl. ¶ 14.

11 The lead plaintiff in this action, appointed by this Court on November 21, 2003, is David
12 Crossen. The individual defendants are Louis G. Lange, a Company founder and its Chairman and
13 Chief Executive Officer ("CEO"), and Daniel K. Speigelman, a Senior Vice President of the Company
14 and its Chief Financial Officer (CFO). Consol. Compl. ¶¶ 20-23. Brent K. Blackburn, the Company's
15 Senior Vice President of Drug Discovery and Pre-Clinical Development and Luiz Belardinelli, the
16 Company's Vice President of Drug Research and Pharmacologic Sciences, were originally named as
17 defendants but have since been dismissed. Plaintiffs allege that each defendant is liable for making false
18 statements or for failing to disclose "adverse facts known to him" about the Company.

19

20 **2.     Discovery: Backup Tape Stipulation**

21 On September 20, 2004, plaintiffs propounded requests for production of documents on CVT.
22 By agreement between the parties, plaintiffs' document requests cover the period from June 24, 2002
23 to June 5, 2004, which is broader than the class period. During the course of depositions in early 2005,
24 plaintiffs learned that defendants had not produced documents contained on CVT's backup tapes. The
25 parties' dispute concerning production of documents from the backup tapes culminated in the parties
26 reaching a stipulation that the Court signed on May 18, 2005 (the "Backup Tape Stipulation"). *See*
27 Docket No. 243.
28 Pursuant to the Backup Tape Stipulation, defendants agreed to make available to plaintiffs the

3

catalogs (indexes) of tapes created in four time periods (June-August 2002; October-December 2002; June-August 2003; and September-December 2003). Plaintiffs were allowed to choose tapes from these catalogs for defendants to restore, and defendants were required to produce emails from these tapes. *See generally id*. Defendants began producing emails from the tapes in a rolling production from late October 2005 until February 2006. According to defendants, plaintiffs received approximately 300,000 employee emails from this production. *See* Snow Oppo. Decl. ¶ 6.

In February 2006, plaintiffs confronted defendants about the existence of additional backup tapes that plaintiffs learned of from an undisclosed source. Defendants found these backup tapes, some of which cover the class period and one of which was created two months after this lawsuit was filed.

## DISCUSSION

**1. Plaintiffs' Motion to Compel and for an Order to Show Cause/Defendants' Motion for a Protective Order to Conclude Document Discovery**

The parties' motions address many of the same issues. Plaintiffs generally contend that defendants have destroyed electronic documents and intentionally hid backup tapes that were only recently discovered after plaintiffs confronted defendants about their existence. Plaintiffs seek an order to show cause why defendants should not be sanctioned for spoliation. Plaintiffs also seek an order (1) ordering defendants to restore and produce all of the mailboxes of 20 witnesses identified by plaintiffs (not just the selected tapes that plaintiffs chose pursuant to the Backup Tape Stipulation), as well as all 26(a) witnesses of plaintiffs and defendants, without review or redaction, or "de-duplication"; (2) ordering defendants to immediately produce, without review or redaction, the newly discovered backup tapes, for restoration, and to pay for the costs of restoration; (3) ordering defendants to provide plaintiffs with immediate access to all documents from the "S" and "H" drives, "eRoom," and "Documentum"; and (4) plaintiffs' attorneys' fees and investigative fees incurred in "documenting CVT's contumacious actions" and preparing the motion to compel.

Defendants deny that they have failed to preserve, destroyed, or hid any documents. Defendants assert that CVT employees were instructed to preserve relevant emails and documents, that all documents were preserved either on the active server or on backup tapes, and that any apparent gaps

4

in production are explained by standard technical processes employed by CVT and defendants' vendor such as the "de-duplication" process (described *infra*), technical procedures to prevent production of non-relevant confidential information, and the manner in which certain mailboxes were stored on multiple servers. Defendants also contend that they have been engaging in good faith in the document production process, which has resulted in the production of nearly 1.4 million pages at a cost to defendants of over $4.3 million.[2] Defendants seek an order concluding document discovery, arguing that the additional discovery that plaintiffs seek is too burdensome and costly.

### A. Defendants' Production to Date

Defendants assert that they have produced (1) over 300,000 pages constituting CVT's archive of all communications to and from the FDA regarding Ranexa from April 1996 to June 2004 (a time period broader than the class period); (2) 300,000 pages of the entire New Drug Application for Ranexa; (3) nearly 300,000 emails from almost 70 employees' accounts on CVT's active server, which included the accounts of the CEO, CFO and 11 additional senior executives; (4) another 300,000 pages of email from key employees' accounts restored from CVT's backup tapes pursuant to the May 18, 2005 Backup Tape Stipulation; and (5) an additional 50,000 emails that defendants' expert outside vendor searched for and restored from the desktop and laptop computers of 10 key employees. *See* Snow Oppo. Decl. ¶ 6.

Plaintiffs dispute defendants' characterization of their production, and argue that in any event, the issue is not what defendants have produced thus far, but whether defendants have failed to produce documents which, if they had been properly preserved and reviewed, should have been produced under the Federal Rules.

### B. Plaintiffs' Claims of Spoliation

Plaintiffs allege that defendants failed to adopt a policy regarding preservation of relevant

---

[2] Defendants state that for the past 15 months, a team of attorneys and paralegals has spent over 23,000 hours gathering, reviewing, bates-stamping and logging hundreds of thousands of documents restored from CVT's hard copy and electronic archives. *See* Snow Oppo Decl. ¶¶ 6-7.

5

documents. Plaintiffs cite selective excerpts of the Sheehy and Haas depositions in which both men state that there was no "policy" to that effect. However, Sheehy also testified at his deposition that both he and CVT's general counsel repeatedly sent emails to all CVT employees instructing them that while the case was pending, they must ensure that all documents and information potentially relevant to the case, including emails, were not inadvertently lost or destroyed. *See* Sheehy Decl. Ex. B and ¶¶ 12-13; *see also* Haas Decl. Ex. B and ¶¶ 9-15 (Haas deposition testimony regarding CVT's steps to preserve evidence). Sheehy has also submitted a declaration also states that prior to the litigation, CVT had a practice of rotating its back up tapes for CVT's active network computer servers in a manner that would result in the "overwriting" of certain tapes, but that after this case was filed, CVT's IM Department was instructed that it should no longer re-use any back up tapes but instead should preserve every back up tape that was created and send it to offsite storage. *See id.* at ¶ 14. In addition, at the hearing defense counsel repeatedly stated that employees were instructed to preserve all relevant evidence, and that all relevant evidence was preserved either on the active server or on backup tapes. The Court concludes that defendants have adequately demonstrated that they took steps to preserve relevant evidence after this lawsuit was filed.

Plaintiffs also allege that defendants intentionally destroyed evidence. As a general matter, plaintiffs contend that defendants "destroyed" evidence when emails were deleted from the active server and saved on backup tapes. Plaintiffs do not contend that any of the backup tapes were destroyed, but rather that by transferring deleted emails from the active server to the backup tapes, defendants made discovery more difficult and expensive, and defendants were able to restrict plaintiffs' access to the backup tapes by claiming such discovery was "inaccessible." The Court is not persuaded by plaintiffs' arguments. There has been no showing that emails were irretrievably destroyed, and because "deleted" emails were preserved on the backup tapes, defendants have not engaged in spoliation. *Cf. E-Trade Sec. LLC v. Deutsch Bank AG*, 230 F.R.D. 582, 591-92 (D. Minn. 2005) (holding party relying on backup tapes to preserve evidence needed to retain copy of backup tapes to ensure no evidence was irretrievably destroyed). Moreover, as defendants note, pursuant to the Backup Tape Stipulation plaintiffs were allowed to select which backup tapes they wanted to be produced. Although this process may have been more difficult from plaintiffs' perspective, the parties negotiated the terms of the Backup

6

Tape Stipulation, and during those negotiations, plaintiffs were aware that emails had been deleted from the active server and transferred to the backup tapes.

Plaintiffs also provide specific examples of alleged spoliation based on comparisons of the backup tape catalogs, defendants' production from the restored tapes, and defendants' production from the active server. These comparisons generally show more emails listed in the catalogs than were actually produced. These comparisons also show that the file structure of mailboxes is different; the catalog listing will show a different (and usually larger) configuration of folders and subfolders than what was produced. Plaintiffs are also suspicious because for certain individuals, there were no emails produced from certain backup tapes.

Defendants generally respond that plaintiffs' spoliation charges stem from a fundamental misunderstanding of the processes used to restore backup tapes. Defendants argue that it is improper to assume that there will be a perfect correlation between the backup tape catalogs and defendants' document production because close to three weeks separate the date that the backup tape catalogs were created and the date that copies of the emails were produced, and because the de-duplication process will eliminate duplicate emails contained in the backup tapes. In addition, defendants argue that emails may not have been produced because they were not responsive to any requests. *See generally* Defendants' Opposition at 17-19. According to defendants, the vendor de-duplicated very few emails from CVT's active server because it was the first source of emails processed in this litigation, while approximately 46% of the emails restored from CVT's backup tapes were duplicative. *See* Mansbridge Decl.¶¶ 11-12 (vendor stating that less than 1% of files from active server removed as duplicative, and approximately 46% of files from backup tapes were duplicative). Defendants contend that the "missing" emails from the December 2003 catalog might have been reviewed and/or produced from any one of the other sources processed by defendants' vendor.

With respect to the changed structure of the mailboxes, defendants state that when processing emails for production, the vendor ran a computer program that placed the responsive, non-privileged emails into separate .PST files. If a folder did not contain any responsive, non-privileged emails, the vendor did not place it in this separate .PST file. *See id.* at ¶ 14. According to defendants, it is standard practice for a document vendor not to include empty folders in a .PST file that is going to be produced

7

in a litigation because it prevents a client's non-responsive confidential information from being inadvertently disclosed.

The Court concludes that defendants have adequately explained, as a general matter, why there might be discrepancies between the number of emails contained on a catalog and the number of emails actually produced. Plaintiffs have not shown that CVT or defense counsel have intentionally deleted emails or otherwise destroyed evidence. For these reasons, the Court DENIES plaintiffs' request for sanctions.

However, because the Court is not satisfied that defendants have sufficiently explained the following specific examples of discrepancies in production, the Court will order additional briefing as set forth below.[3]

### (1)    Colin Hislop

Plaintiffs assert that the December 8, 2003 catalog of Hislop's email box shows he had 47 emails in the "Ranexa Core Team" subfolder of his "inbox," but that defendants' production from the restoration of the December 28, 2003 backup tape includes only one email from the same folder. That sole email dates back to May 28, 2003.

Defendants respond that a new contract attorney did a poor job reviewing Hislop's December 28, 2003 mailbox on his first day at work. Defendants have identified over 150 emails improperly withheld, and these emails are now slated to be bates-stamped and produced to plaintiffs. Defendants have reviewed all the subsequent mailboxes reviewed by this contract attorney and confirmed that the quality of his review markedly improved after Hislop's mailbox. *See* Snow Oppo. Decl. ¶ 16, Ex. E.

It is unclear whether the 150 emails identified by defendants include the 46 emails referenced by plaintiffs. **By April 10, 2006, defendants shall file a declaration with the Court clarifying**

---

[3] In their papers and at the hearing, defendants directed the Court to Exhibit M of the Snow declaration, which addresses most of plaintiffs' allegations of spoliation. However, the Court finds that this exhibit, which repeatedly states that there has been "no significant inadvertent" failure to produce, does not adequately explain the discrepancies at issue, nor does it provide assurances that there was not, in fact, a failure to produce relevant documents.

8

**whether the 46 emails referenced by plaintiffs are included in the 150 emails. If the 46 emails are not included in the 150 emails, defendants shall explain, with particularity, why those 46 emails were not produced, or alternatively defendants shall produce those 46 emails to plaintiffs.**

### (2) David McCaleb

According to plaintiffs, the catalog of the December 3, 2003 backup tape shows that McCaleb maintained a large "deleted items" folder with several hundred, if not several thousand, emails. McCaleb also maintained a "Ran Teams-Comm" subfolder housing what appear to be solely Ranexa-related communications, and at least 27 emails in this subfolder were entitled "Ranexa TM Core Team Minutes," which plaintiffs assert are clearly related to this litigation. Defendants produced one email for McCaleb from the December 28, 2003 backup tapes dated October 13, 2003 and titled "Ranexa TM Core Team Minutes."

Defendants respond that they reviewed and produced two McCaleb mailboxes from two different servers from the December 28, 2003 backup tapes. Both were produced on January 12, 2006. Defendants state that a number of emails were removed through the de-duplication process, that there was no "significant inadvertent" failure to produce, and that they produced "several" emails titled "Ranexa TM Core Team Minutes." Although this explanation may fully account for the discrepancy, the Court is unable to reach this conclusion without more specific information. **By April 10, 2006, defendants shall file a declaration explaining, with particularity, why the emails at issue ("deleted items" emails, the emails in the "Ran Teams-Comm" subfolder, and the balance of the 27 emails titled "Ranexa TM Core Team Minutes) were not produced. In lieu of such an explanation, defendants may produce these emails.**

### (3) Dan Spiegelman

Plaintiffs state that no emails were produced for Spiegelman's "inbox" or "outbox" from the December 28, 2003 backup tapes, and only 10 emails were produced from Spiegelman's "sent items," all but three of which were dated months earlier. Plaintiffs assert that Spiegelman deleted emails because the hard copy production of documents from Chris Chai shows receipt of an email with an

9

attachment created and sent by Spiegelman on November 24, 2003, but no such email was produced from Spiegelman's box.

Defendants state that upon re-review of Spiegelman's mailbox, they discovered the email that plaintiffs asserted was in Chris Chai's hard copy production but missing from Spiegelman's mailbox. Defendants state that this email and its attachment were inadvertently withheld as privileged during Defendants' initial review, and that they will produce the email version. In light of defendants' agreement to produce the email version, and because the hard copy version has already been produced, the Court finds no further explanation by defendants is necessary. However, other than generally referring to the de-duplication process, defendants do not specifically address plaintiffs' charge that Spiegelman appeared to be deleting emails. **By April 10, 2006, defendants shall file a declaration specifically addressing plaintiffs' charge that Spiegelman was deleting emails and explaining why no emails were produced from his "inbox" or "outbox."**

**(4)     Lou Lange**

As with Spiegelman, plaintiffs note that no emails were produced from Lange's "inbox," "outbox," or "sent items" for the August 3, 2003 backup tapes. Defendants respond that approximately 93% of the emails in Lange's mailbox were removed as duplicative. Defendants do not explain why the remaining 7% of emails were not produced. Defendants do not state that these emails were not responsive, or that they are privileged. **By April 10, 2006, defendants shall file a declaration explaining why the remaining 7% of emails were not produced, or alternatively, defendants shall produce these documents to plaintiffs.**

**(5)     Organization of mailboxes**

Plaintiffs contend that defendants should not be allowed to alter the mailbox structure because such alteration destroys the evidence of where defendants or their employees kept their emails and thus the importance placed on them. Plaintiffs also assert that altering the structure of mailboxes is contrary to the Backup Tape Stipulation, and that defendants agreed to produce documents in their native format. Plaintiffs do not contend that in the course of any structural alteration that any emails were destroyed.

10

The Court concludes that the Backup Tape Stipulation does not prevent defendants from altering the mailbox structure in the course of restoring and producing emails. There is no language in the Stipulation addressing this issue, and indeed plaintiffs have not cited any provision of the Stipulation in support of their contention. Defendants have submitted the declaration of their outside vendor (Mansbridge) stating that this is "common practice" in the industry, and that it is done to separate what potentially needs to be produced from what does not, and that it preserves confidential business information. The Court concludes that defendants have provided a reasonable explanation for the alterations.

### C. Documents contained on newly-discovered backup tapes

According to the declaration of defendants' counsel Peter Snow:

> On February 1, 2006, Jay Pomerantz, Traci Keith and I had a telephone conversation with Plaintiff's counsel regarding Defendants' document production. During this meet and confer, Plaintiff's counsel repeatedly pressed Defendants to make a representation that there were not other systems in place at CVT during the Class Period for backing up CVT's computer network. We informed Plaintiff that Defendants would consider providing such a representation in return for Plaintiff's agreement that Defendants had satisfied their discovery obligations. However, we did state that Latham was not aware of any other system to backup CVT's network servers, such as CVT's S drive and email exchange server.
>
> During the same telephonic meet and confer on February 1, 2006, Plaintiff's counsel informed us that they had reason to believe, based on information from an undisclosed source, that CVT had a practice during the Class Period of backing up the hard drives of the computers of high-level executives. Plaintiff's counsel described the kind of computer, software, and backup media that they believed were used for this purpose. Plaintiff further told Defendants the specific location where Plaintiff believed the Exabyte tapes used to back up senior executives' computers were stored.

Snow Opposition Decl. ¶¶ 18-19. After searching, defendants discovered a number of Exabyte and DLT tapes in a safe located next to the desk of CVT employee Floyd Haas, who had previously testified on behalf of CVT as a Rule 30(b)(6) deponent as the person most knowledgeable about CVT's back-up tapes. The Exabyte tapes appear to contain backups of CVT employees' hard drives, and the DLT tapes contain backups of CVT's email exchange server during August and September 2002. *See* Snow Oppo. Decl. Ex. I.

Defendants sent the newly discovered tapes to its vendor for analysis. The Exabyte tapes appear to contain backups of desktop and laptop computers. *See* Mansbridge Decl. ¶ 16. According to

11

1 defendants, the vendor determined that 170 of the newly discovered Exabyte tapes from the time period 2 covered by the Backup Tape Stipulation (which comprise six sets up backups)[4] are potentially 3 restorable, and 16 of the newly discovered DLT tapes from August 2002 are potentially restorable (it 4 is unclear if the September 2002 DLT tapes are potentially restorable). *See* Snow Oppo. Decl. ¶ 24.

5 In the meet and confer process prior to the filing of the instant motions, defendants offered to 6 provide the following limited discovery from the newly discovered backup tapes: either (1) production 7 of responsive, non-privileged emails from five CVT employees' mailboxes, to be selected by plaintiffs, 8 from one August 2002 backup of CVT's email exchange server (the DLT tapes), or (2) production of 9 responsive, non-privileged emails from the hard drive backups for five CVT employees, to be selected 10 by plaintiffs, from one of the six sets of Exabyte tapes. *See id.* at Ex.I. Initially defendants conditioned 11 this offer upon plaintiffs' agreement that defendants will have satisfied their document production 12 obligations once they complete any such additional production, but after plaintiffs rejected this offer, 13 they removed that condition.

14 Plaintiffs contend that it is "beyond comprehension" that defendants claim no knowledge of 15 these tapes. Plaintiffs state that it is "incredible" that CVT's two 30(b)(6) deponents (Sheehy and Haas) 16 on document preservation did not know of the existence of the tapes – especially since the tapes were 17 located in a safe next to Haas' desk. Both Sheehy and Haas have submitted declarations stating that 18 they had no knowledge of the existence of these tapes prior to their discovery. *See* Sheehy Decl. ¶ 10; 19 Haas Decl. ¶¶ 17-19.

20 Defendants assert that the majority of the Exabyte tapes only contain backups of "ordinary CVT 21 employees' hard drives, not those of senior executives." Def's Opposition at 11. However, plaintiffs 22 correctly note that defendants have only located a catalog for one of the six sets of potentially 23 recoverable tapes for the period for the relevant time period, and thus nobody knows what is actually 24 contained on these tapes. Moreover, plaintiffs assert that the catalog that has been produced lists the 25 hard drives of each individual defendant, key CVT witnesses and high level executives identified in the

26

---

27 [4] It is unclear how much information is contained on each of the Exabyte sets. Defendants' vendor located a catalog for the July 4, 2002 Exabyte set, which consists of 288 names of hard drives. 28 *See* Snow Oppo. Decl. Ex. I.

12

case.

The Court concludes that plaintiffs have not demonstrated that defendants intentionally hid the existence of the backup tapes. However, it is undisputed that the newly discovered backup tapes should have been sent to the offsite storage location, and that if they had been, they would have been subject to the terms of the Backup Tape Stipulation. In light of the peculiar circumstances surrounding the discovery of the backup tapes, the Court orders as follows: **no later than April 24, 2006, defendants shall review and prepare full catalogs for all Exabyte and DLT tapes from the time period covered in the Backup Tape Stipulation. Plaintiffs shall review these catalogs, and inform defendants by April 28, 2006, which documents plaintiffs wish to have produced. Defendants shall produce all requested documents, except those protected by a privilege, by May 19, 2006. Defendants shall prepare and produce a privilege log for any documents withheld on account of privilege by May 26, 2006. The parties may modify any of these dates through the meet and confer process. Defendants shall bear the full cost associated with all of this discovery.**

### D. Documents from "S" and "H" drives, "Documentum" and "eRoom"

Discovery from these sources is the subject of both plaintiffs' motion to compel and defendants' motion for a protective order. The "H" drive is a drive where CVT employees could store personal documents and e-mails, and it may contain FDA submissions and correspondence. *See* Kathrein Decl. in Support of Plaintiffs' Motion to Compel, Ex. 25 at 32, 34, 38, 50-51, 58. The "S" drive is the drive on which employees can share documents, and it contains FDA submissions and correspondence. *See id.* at 38, 50-51. The "eRoom" was a form of communication at CVT used like e-mail, and it was a place where people could work together electronically, and post, share, comment upon, and edit documents. *See id..* at 70-74. "Documentum" is CVT's database management system which, among other things, stores FDA communications. *See id.* at 50. All four sources contain primarily non-email documents types, such as Word, PowerPoint, Excel and Adobe Acrobat. *See* Snow Protective Order Decl. ¶¶ 27, 38.

Although defendants previously represented to plaintiffs that these sources would be searched,

13

defendants have not searched these sources for responsive documents. *See* Sheehy Decl. ¶ 16.[5] Defendants first told plaintiffs that they would not be producing any documents from these sources on January 19, 2006. Defendants contend that the burden and cost of searching these sources far outweigh any benefits to plaintiffs. Defendants estimate that it would take about 7,000 person hours to review the "S" and "H" drives, or put differently, a team of seven people, working 40 hours a week, over six months. *See* Snow Decl. in Support of Motion for Protective Order ¶¶ 34-36. Defendants estimate the cost of this review to be well over $1 million. *See id.* at ¶ 37. Defendants estimate that it would take over 20,000 person hours to complete the review of documents on "Documentum" and "eRoom," taking a team of 13 people, working 40 hours a week, approximately 10 months. *See id.* at ¶¶ 50-51. Defendants estimate the cost to be over $2.2 million. *See id.* at ¶ 52. Alternatively, defendants request that plaintiffs be required to narrow their search and to pay for the costs associated with this discovery.

The Court is mindful of defendants' concerns regarding the costs and burden associated with this discovery. At the same time, the Court concludes that plaintiffs are entitled to some limited discovery from these sources because they have demonstrated that these sources are likely to contain relevant documents. In order to balance the competing concerns of the parties, the Court orders as follows: **by April 24, 2006, defendants shall prepare and produce to plaintiffs an index of the documents contained on the "S" and "H" drives, eRoom and Documentum for the active server only. By April 28, 2006, plaintiffs shall inform defendants which documents that they wish to have produced. Plaintiffs are limited to choosing documents created between June 1, 2002 and December 31, 2003. Defendants shall produce all requested documents, except those protected**

---

[5] Douglas Sheehy, CVT's senior corporate counsel, testified as CVT's Rule 30(b)(6) designee on the location of electronic data and back-ups at CVT. During his deposition, Sheehy was asked whether "all the different drives" on CVT's computer network were being searched for responsive documents. Sheehy replied, "It's ongoing, so I believe, at this point – we started in November, and we're still slugging through it. There's a lot of data. I believe, at this point, the S drive and the H drive, perhaps the email drive or the exchange server, have all been copied to allow for searching for potentially responsive communications to the document requests. We do intend to move through whatever servers we haven't yet gotten to, and it's possible there's a couple we haven't, because we're focused on areas where we would expect to find the most responsive documents." CVT's outside counsel, Peter Snow, added that eRoom and Documentum "were on the list of drives that are in the process of being searched." Sheehy Decl. Ex. C. Defendants' assertion that neither Sheehy nor Snow ever said that defendants were in fact searching these sources is semantic gameplaying and is not persuasive.

14

**by a privilege, by May 19, 2006. Defendants shall prepare and produce a privilege log for any documents withheld on account of privilege by May 26, 2006. The parties may modify any of these dates through the meet and confer process. Plaintiffs shall bear 100% of the costs of defendants' vendor incurred <u>after</u> the creation of the indexes. Defendants shall bear 100% of the costs of the vendor incurred in the creation of the indexes, as well as the costs of defense counsel associated with this discovery.**

### E. Defendants' Search Terms

According to defendants, they used overly broad search terms to separate documents that were potentially relevant from those that were clearly irrelevant, and then the potentially relevant documents were reviewed by defendants' legal team for responsiveness and privilege. Plaintiffs assert that the use of search terms is improper, although plaintiffs do not state what method they think defendants should have used to conduct the massive document review in this case. The Court concludes that the use of search terms is an appropriate tool for electronic discovery, particularly in a case of this scope.

Defendants have agreed to produce the search terms, but only if plaintiffs sign a written agreement agreeing that (1) defendants' production of the search terms shall not constitute a waiver of the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or doctrine; (2) the search terms shall be treated as "Highly Confidential – Attorneys' Eyes Only" pursuant to the protective order in place in this case; and (3) if plaintiffs wish to file the search terms with any court, plaintiffs shall request that the court file the search terms under seal. *See* Snow Decl. in Opposition to Plaintiff's Motion to Compel Ex. C.

The Court concludes that defendants' proposal is reasonable, and plaintiffs have not provided any explanation why they should not agree to these terms. Accordingly, the Court GRANTS plaintiffs' motion to compel the search terms, subject to the written confidentiality agreement proposed by defendants.

### 2. Plaintiffs' Motion to Compel Documents Designated As Privileged

Plaintiffs seek an order compelling defendants to immediately produce hundreds of documents

1 designated as privileged and withheld by defendants, or alternatively to produce these documents for
2 *in camera* review. In their motion, plaintiffs contend that nearly all of the 553 entries on defendants'
3 two privilege logs fail to demonstrate any basis to support the claimed privileges. As a result of the
4 motion, defendants re-reviewed the documents at issue and have agreed to produce additional
5 documents, in whole or in redacted part. According to defendants, the dispute has been narrowed to 338
6 documents constituting 3,220 pages.

7 Defendants have withheld documents on the grounds of attorney-client privilege and the attorney
8 work product doctrine. The burden is on the withholding party to establish that the documents at issue
9 are protected. *See United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002). To meet this burden, the
10 withholding party must provide sufficient information to "enable other parties to assess the applicability
11 of the privilege or protection." Fed. R. Civ. Proc. 26(b)(5). Courts have interpreted Rule 26(b)(5) to
12 require a withholding party to identify, for each document described in a privilege log, the date, subject
13 matter, and the "purpose[] and an explanation as to why the document should be privileged and not
14 produced in discovery." *Coltec Indus. v. Am. Motorists Ins. Co.*, 197 F.R.D. 368, 373 (N.D. Ill. 2000).
15 "Blanket assertions are extremely disfavored." *Martin*, 278 F.3d at 1000 (internal citation and
16 quotations omitted).

17 Here, defendants have advanced various arguments in their opposition brief and declarations
18 regarding why different categories of documents are protected, but they do not address specific
19 documents. *See generally* Suvari Decl.[6] More importantly, the privilege logs generally do not contain
20 specific information that would support the application of a privilege or protection to particular
21 documents. For example, defendants claim Hard Copy Log No. 51, described as "Memo regarding
22 Ranolazine Draft Labeling," which was authored by Carol Karp, VP Regulatory Affairs and sent to over

---

[6] Suvari, whose title is Vice President, General Counsel and Assistant Secretary, states, *inter alia*, that it is "common practice" at CVT for members of the Board of Directors and other employees to solicit or receive legal advice from CVT's attorneys at board meetings; that it is "common practice" at CVT for employees to request or receive legal advice from CVT's attorneys at business meetings; that it is a "common practice" at CVT for employees to make an "implied request" for legal review and advice from CVT's attorneys by sending or copying communications and documents to the attorneys, even where such communications or documents do not expressly solicit legal review or advice; that it is a "common practice" at CVT for employees to request or receive legal advice from CVT's attorneys by sending them (or receiving from them) drafts of business-related documents. *See* Suvari Decl. ¶¶ 7-11.

16

20 individuals, including the general counsel, is a protected attorney-client communication. *See* Acevedo Decl. Ex. B at #51. The log does not contain any additional information to establish that the communication was made in confidence in the course of seeking legal advice. *See Martin*, 278 F.3d at 999 (describing elements of attorney-client privilege).

Similarly, defendants claim Email Log No. 72, described as "Email string regarding Board of Directors Meeting," authored by Scott Greer (Board of Directors member) and Lou Lange (CEO), and sent to other Board of Directors members and cc'd to outside counsel, is protected by the attorney-client privilege. *See* Acevedo Decl. Ex. C at #72. However, aside from the fact that counsel was cc'd on the email string, there is no information in the privilege log to demonstrate with any reasonable certainty that the communication is in fact privileged. Defendants' generalized assertion of privilege is insufficient to meet their burden. *Cf. Segerstrom v. United States*, 2001 WL 283805, at *3-4 (N.D. Cal. Feb. 6, 2001) (upholding claim of attorney-client privilege based upon detailed declaration describing 10 documents at issue and demonstrating elements of privilege).

The Court concludes that an *in camera* review of the documents at issue is warranted in order to analyze defendants' assertion of privilege. The Court hereby REFERS this matter to a magistrate judge. The parties shall be contacted by the magistrate judge regarding the *in camera* proceedings.

**CONCLUSION**

Accordingly, the Court DENIES defendants' motion for a protective order (Docket No. 266), GRANTS in part and DENIES in part plaintiff's motion to compel production and for an order to show cause (Docket No. 268), and GRANTS plaintiff's motion to compel documents designated as privileged, and REFERS the *in camera* review of the documents claimed as privileged to a magistrate judge. (Docket No. 263). Both sides have requested fees and costs associated with the instant motions. These requests are DENIED

**IT IS SO ORDERED.**

Dated: April 3, 2006

SUSAN ILLSTON
United States District Judge